IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No.**

**HOMERO NAVARRO,**

    Plaintiff,

v.

**BIOP, LLC D/B/A BILLY'S INN,**
**a Colorado limited liability company,**

**CITY STREET INVESTORS LLC,**
**a Colorado limited liability company,**

**LARIMER ASSOCIATES, LLC,**
**a Colorado limited liability company, and**

**HERMANSON, INC.,**
**a Colorado corporation,**

    Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, Homero Navarro ("Plaintiff" or "Navarro"), by and through his attorneys, HKM Employment Attorneys LLP, brings this Complaint and Jury Demand ("Complaint") against Defendant BIOP, LLC d/b/a Billy's Inn ("Billy's Inn"); City Street Investors LLC ("City Street"); Larimer Associates, LLC ("Larimer"); Hermanson, Inc. ("Hermanson") (together, the "Companies" or "Defendants"), and, in support thereof, alleges as follows:

1

# PRELIMINARY STATEMENT

1. This case arises from Plaintiff's employment with the Companies, during which time the Companies discriminated against Plaintiff because he is a male, practicing Catholic, and because he took one week of leave for the birth of and care for his newborn.

2. Navarro worked for the Companies from 2011 through 2021 and was successful in his role as a Line Cook and, after a promotion, in his role as Back of House Manager.

3. In or about August 2020, Navarro informed Ana Melgar, the then-Back of House Manager, that his wife was pregnant and that he anticipated needing one week of leave pursuant to the Family and Medical Leave Act ("FMLA") in or about January 2021.

4. In or about October 2020, Navarro began attending First Communion/Confirmation ("Communion") classes. He promptly informed Melgar and asked for the reasonable accommodation of not working on Thursday evenings so that he could attend classes.

5. In January 2021, Navarro's wife gave birth to their daughter, and Navarro requested approximately one week of leave to attend the birth and help care for his daughter.

6. Approximately eight days after Navarro's daughter was born, the Companies hired Gutierrez Sabas to replace Navarro, reduced Navarro's shifts, and offered Navarro shifts that they knew Navarro could not work due to his requested religious accommodation.

7. On or about March 5, 2021, Navarro was terminated as that was the final day that the Companies included Navarro on the schedule.

8. Throughout his employment, Navarro frequently worked 12 to 15-hour days during which he received no state-mandated breaks.

9. The Companies violated Colorado Wage and Hour Law by failing to provide Navarro with compensated 10-minute rest breaks.

10. Under Colorado Wage and Hour Law, employers in covered industries are required to provide compensated 10-minute rest breaks to each employee for every four hours, or major fractions of four hours, worked by the employee. 7 C.C.R. 1103-1 § 8 (2018-19); 7 C.C.R. 1103-1, Rule 5.2 (2020-21). The Companies did not generally provide such breaks to Navarro, thus violating Colorado Wage and Hour Law.

11. As a result of the Companies unlawful conduct, Navarro has suffered significant damages. Navarro now brings the following claims against the Defendants: (1) Failure to Provide Paid Rest Periods in Violation of Colorado Wage and Hour Law; (2) Retaliation in Violation of the Family and Medical Leave Act; (3) Discrimination and Failure to Accommodate Based on Religion in Violation of Title VII; (4) Discriminatory Discharge Based on Religion in Violation of Title VII; (5) Discrimination and Failure to Accommodate Based on Religion in Violation of the Colorado Anti-Discrimination Act; (6) Discriminatory Discharge Based on Religion in Violation of the Colorado Anti-Discrimination Act; and (7) Discriminatory Discharge Based on Gender in Violation of Title VII.

## PARTIES

12. Plaintiff incorporates all the paragraphs of this Complaint as though set forth fully and separately herein.

13. Navarro is, and at all times relevant to this Complaint was, a resident of Colorado.

14. Navarro began working for the Companies in or about 2011.

 a. Billy's Inn.

15. Defendant BIOP, LLC d/b/a Billy's Inn ("Billy's Inn"), is a Colorado limited liability company that is an "employer" under Colorado Wage and Hour Law (see 7 C.C.R. 1103-1:1 § 1.6).

16. Billy's Inn's principal office is located at 1530 16th Street, Third Floor, Denver, Colorado 80202.

 b. City Street.

17. Defendant City Street Investors LLC ("City Street") is a Colorado limited liability company that is an "employer" under Colorado Wage and Hour Law (*see* 7 C.C.R. 1103-1:1 § 1.6).

18. City Street's principal office is located at 1115 Acoma Street, Suite 200, Denver, Colorado 80204.

 c. Larimer.

19. Defendant Larimer Associates, LLC ("Larimer") is a Colorado limited liability company that is an "employer" under Colorado Wage and Hour Law (*see* 7 C.C.R. 1103-1:1 § 1.6).

20. Larimer's principal office is located at 1530 16th Street, Third Floor, Denver, Colorado 80202.

 d. Hermanson.

21. Defendant Hermanson, Inc. ("Hermanson") is a Colorado limited liability company that is an "employer" under Colorado Wage and Hour Law (*see* 7 C.C.R. 1103-1:1 § 1.6).

22. Hermanson's principal office is located at 1530 16th Street, Third Floor, Denver, Colorado 80202.

e. <u>Navarro Was An Employee of the Companies.</u>

23. Together, City Street, Billy's Inn, Larimer, and Hermanson are referred to herein as the "Companies."

24. Navarro is a former employee of the Companies and, at all times pertinent to the Complaint, was an employee of the Companies.

25. Plaintiff worked at the Companies' Berkeley/Denver location, at 4403 Lowell Boulevard, Denver, Colorado 80236.

26. At all times relevant to this Complaint, Navarro was an "employee" of the Companies under Colorado Wage and Hour Law. C.R.S. § 8-4-101(5).

27. At all times relevant to this Complaint, the Companies were "employers" of Navarro under Colorado Wage and Hour Law. C.R.S. § 8-4-101(6).

28. The Companies are employers within the meaning of 29 U.S.C. § 2611(4)(A), in that they have more than 50 employees within a 75-mile radius.

29. The Companies are employers within the meaning of 42 U.S.C. § 12111(5)(A), in that they have 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

f. <u>The Companies are a Single and/or Joint Employers.</u>

30. The Companies are deemed a single employer of Plaintiff by virtue of their centralized control of employment practices, common management, common rules regarding

management, interrelations of operations, and common ownership or financial control. The Companies are therefore jointly and severally liable on all claims asserted in this action.

31. "[T]wo entities may be considered 'joint employers' where they both exercise some control over the work or working conditions of the employee." *Harbert v. Healthcare Services Group, Inc.*, 391 F.3d 1140, 1148 (10th Cir. 2004) (citing 29 C.F.R. § 825.106(b)).

32. The Companies constitute a single and/or joint employer, as they have (i) common management; (ii) interrelation between operations; (iii) centralized control of labor relations; and (iv) degree of common ownership/financial control. *See* 29 C.F.R. § 825.104.

33. The Companies constitute as Plaintiff's employers because their employees acted directly and/or indirectly in the interest of an employer in relation to Plaintiff. *See* 29 U.S.C. § 825.14.

34. The following are a few, but not a complete list, of examples as to why the Companies constitute a single and/or joint employer and/or constitute as Plaintiff's employers:

   a. Since 1933, Billy's Inn has owned and operated restaurants in the Denver area. Billy's Inn boasts that customers are "always welcome as family!"

   b. City Street is a company that "[t]hrough transformative real estate investments & strategic business operations" is able to "turn spaces to places." Billy's Inn is one of City Street's "restaurant partnerships."

   c. Larimer is a real estate company based in Denver, with a portfolio including retail, offices, parking garages, and restaurant spaces. Larimer was a key player in some of Denver's most iconic projects, including Larimer Square and Union Station.

d. Larimer purchased Billy's Inn in 2008 and opened a second Billy's Inn location in 2022.

e. Hermanson is a real estate investment and management company operating in Colorado, California, and New Mexico.

f. Upon information and belief, Hermanson is the parent company of Larimer.

g. Upon information and belief, Larimer directs all human resource functions for Hermanson.

h. Upon information and belief, Larimer provides consultative Human Resources services to restaurant investment partners, including but not limited to Billy's Inn and City Street.

i. Upon information and belief, Larimer acts as advisor to 25 or more chef owned restaurants with regards to employee relations, state and federal compliance, and best practices for personnel management.

j. Upon information and belief, Larimer manages a shared service team responsible for administration of payroll, benefits, and worker's compensation, including but not limited to for Billy's Inn and City Street.

## JURISDICTION AND VENUE

35. Plaintiff incorporates by reference all paragraphs in this Complaint as though set forth fully and separately herein.

36. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

37. This Court has jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims are so related to the federal claims that they form part of the same case or controversy.

38. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

### ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

39. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

40. Plaintiff dually filed his Charges of Discrimination with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC") against the Companies for associational basis discrimination (based on his wife's pregnancy and/or disability), religious discrimination and retaliation, and sex/gender discrimination and retaliation, on or around April 26, 2021, Charge Numbers E2100012113 and 32A-2021-00579.

41. Plaintiff was issued a Notice of Right to Sue with respect to Charge Number E2100012113 on May 9, 2022, and Plaintiff filed the present action within ninety (90) days of receipt of same.

42. Plaintiff received a Notice of Right to Sue with respect to Charge Number 32A-2021-00579 on or about June 22, 2022.

43. Plaintiff has met all administrative prerequisites prior to filing this action.

### FACTUAL ALLEGATIONS

44. Plaintiff incorporates by reference all paragraphs in this Complaint as though set forth fully and separately herein.

45. Navarro began working for the Companies as a Line Cook on or about June 29, 2011.

46. Throughout 2020 and 2021, Navarro typically worked four shifts per week for the Companies.

47. In or about August 2020, Navarro informed the Companies – through then-Back of House Manager, Ana Melgar – that his wife was pregnant. Melgar congratulated Navarro and responded that the Companies would be ready to handle staffing and scheduling issues when his baby was anticipated to arrive, so that Navarro could take leave for the birth and to help care for his daughter.

48. On or about October 17, 2020, Navarro informed the Companies (via Melgar) that he was attending First Communion classes for his religion, Catholicism, on Thursday evenings and requested the reasonable accommodation of not working Thursday evenings.

49. Throughout his employment, Navarro repeatedly reminded Melgar that he was unable to work on Thursdays due to communion classes.

50. To show Melgar that he was attending Communion classes, Navarro even provided her a letter from his church on one occasion.

51. In or about December 2020, Navarro asked the Companies for approximately one week off of work to help care for his daughter after her birth.

52. On or about January 15, 2021, Navarro's wife gave birth to their daughter.

53. Navarro reminded the Companies – through Melgar – that he needed approximately one week off of work to help care for his newborn daughter. The Companies approved his request.

54. Following his leave, however, the Companies treated Navarro significantly worse, including by reducing his hours and then taking him off of the schedule.

55. On or about January 22, 2021, Navarro intended to return from his approved leave at his prior schedule of four days per week, so he spoke with Melgar to ask when he could return to work.

56. In response, and in retaliation for his decision to take leave, Melgar reduced Navarro's work schedule from four shifts per week to two shifts per week

57. Likewise, in retaliation for taking leave, Melgar insisted that Navarro had to work on Sundays (a day which Melgar knew Navarro was unable to work).

58. Shortly after Navarro was given the new shifts, he learned that Sabas had been hired to replace him while he was on pre-approved leave for the birth of his child.

59. Upon information and belief, Sabas' first day of work for the Companies was on or about January 23, 2021.

60. Upon information and belief, Sabas' first day of work for the Companies was eight days after Navarro's wife gave birth to their daughter.

61. Upon information and belief, Melgar gave the shifts that had previously been Navarro's to Sabas.

62. On or about February 26, 2021, Navarro asked Melgar why Sabas, as a new employee, was given those shifts instead of him.

63. Melgar responded: "Because you don't want to work."

64. By this, Melgar again showed she was upset that Navarro requested leave for his daughter's birth.

65. On or about February 26, 2021, Melgar told Navarro that he *must* agree to take additional shifts or else she would reduce his pay by $5 or $6 per hour.

66. Navarro agreed, and asked Melgar to assign him more shifts.

67. However, the only additional shift Melgar offered Navarro was on Thursday evenings, when Melgar knew Navarro was unavailable due to his religion, as he was attending Communion classes on Thursdays and because he had previously requested the reasonable accommodation of not working on Thursday evenings due to his Communion classes.

68. Ultimately, the Companies removed Navarro from the schedule. The last day that the Companies had Navarro on the schedule was on or about March 5, 2021.

69. On or about March 8, 2021, Navarro asked Melgar for a copy of the schedule.

70. Melgar did not respond to Navarro's message.

71. Later that day, Navarro obtained a copy of the schedule and learned that he was still not scheduled.

72. The following day, on or around March 9, 2021, Navarro called Chad Hankins (General Manager) to ask why he was not on the schedule, to request that Hankins add him back onto the schedule, and to see whether he was terminated.

73. Hankins did not return Navarro's phone call.

74. The Companies retaliated against and terminated Navarro for taking leave. And, despite Navarro's requests to Melgar and Hankins to put him back on the schedule, the Companies refused to rehire him.

75. During his employment, Navarro frequently worked shifts of 12 to 14 hours per day, one to four days per week, though he often worked over 15 hours per day.

76. Navarro did not receive paid 10-minute rest breaks during his shifts.

77. During Navarro's employment with the Companies, he was rarely – if ever - given his legally mandated rest breaks. Navarro estimates that he was deprived of at least four breaks per pay period per week (40 minutes of wages), or about 17 breaks per month, from January of 2016 until he was terminated in March of 2021.

78. Based upon Navarro's estimates and without access to the full documentation held by the Companies, Navarro is entitled to compensation of at least $8,201.70, plus applicable statutory penalties, attorney's fees, and costs, based on the rest breaks that he was not provided.

79. On or about January 27, 2022, Navarro sent a letter to the Companies demanding immediate payment of his unpaid wages.

80. The Companies failed to provide any response to the letter and did not provide any additional compensation based on Navarro's demand for payment of wages.

81. At all times relevant to this Complaint, the Companies were aware of, or should have been aware of, the rest break requirements in Colorado Wage and Hour Law, and nevertheless failed to provide rest breaks. The Companies' violations of Colorado Wage and Hour Law were therefore willful.

**FIRST CLAIM FOR RELIEF**
**Failure to Provide Paid Rest Periods in Violation of Colorado Wage and Hour Law**
**Colo. Const. Art. XVIII § 15 C.R.S. § 8-4-101, *et. seq*. 7 C.C.R. 1103-1**
**(As to All Defendants)**

82. Plaintiff incorporates by reference all paragraphs in this Complaint as if fully and separately set forth herein.

83. At all times relevant to this Complaint, the Companies were "employers" covered by Colorado Wage and Hour Law. C.R.S. § 8-4-101(6); 7 C.C.R. 1103-1 § 1, 2 (2018-19).

84. At all times relevant to this Complaint, Navarro was an "employee" of the Companies under Colorado Wage and Hour Law. C.R.S. § 8-4-101(5).

85. Under Colorado Wage and Hour Law, the Companies were required to provide Navarro with a compensated 10-minute rest break for each four hours, or major fraction of four hours, that he worked. 7 C.C.R. 1103-1 § 8 (2018-19); 7 C.C.R. 1103-1, Rule 5.2 (2020-21).

86. The Companies violated Colorado Wage and Hour Law by generally failing to provide Navarro with compensated 10-minute rest breaks.

87. Failure by an employer to provide a 10-minute paid rest break is a failure to pay 10 minutes of wages at the employee's agreed upon or legally required (whichever is higher) rate of pay. *See* 7 C.C.R. 1103-1, Rule 5.2.4.

88. Accordingly, the Companies are liable to Navarro for all unpaid wages, totaling at least $8,201.70, plus statutory penalties, and attorneys' fees and costs.

89. The Companies' violations of Colorado Wage and Hour Law were willful.

**SECOND CLAIM FOR RELIEF**
**Retaliation in Violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*
(As to All Defendants)**

90. Plaintiff incorporates by reference all paragraphs in this Complaint as if fully and separately set forth herein.

91. Defendants are all "covered employers" as defined in 29 U.S.C. § 2611(4) under the FMLA.

92. The term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(ii)(I).

13

93. As "covered employers" under the FMLA, Defendants are required to offer any "eligible employee," as defined at 29 U.S.C. § 2611(2), up to 12 weeks of leave from work.

94. A stated purpose of the FMLA is to address the fact that "it is important for the development of children and the family unit that fathers and mothers be able to participate in early childrearing and the care of family members who have serious health conditions[.]" 29 U.S.C. § 2601(a)(2).

95. A stated purpose of the FMLA is "to balance the demands of the workplace with the needs of families, to promote the stability and economic securities of families, and to promote national interests in preserving family integrity[.]" 29 U.S.C. § 2601(b)(1).

96. A stated purpose of the FMLA is "to entitle employees to take reasonable leave for . . . the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition[.]" 29 U.S.C. § 2601(b)(2).

97. Plaintiff availed himself of a protected right under the FMLA by taking FMLA leave for "the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(1)(B).

98. Defendants took actions that a reasonable employee would have found to be materially adverse when: (1) Defendants reduced Plaintiff's shifts a few days after Plaintiff returned from leave; (2) Defendants scheduled Plaintiff to work on days when they knew Plaintiff was not available after Plaintiff returned from leave; (3) Defendants took Plaintiff off of the schedule; (4) Defendants refused to return Plaintiff's calls and text messages, or to add Plaintiff back into the schedule, thereby terminating his employment.

99. Defendants' violation of the FMLA was willful and without justification.

100. Defendants' above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

101. Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

**THIRD CLAIM FOR RELIEF**
**Discrimination and Failure to Accommodate Based on Religion in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII")**
**(As to All Defendants)**

102. Plaintiff incorporates by reference all paragraphs in this Complaint as if fully and separately set forth herein.

103. Plaintiff was qualified for the position he held with the Companies and at all times met his employer's legitimate performance expectations.

104. Throughout his employment with the Companies, and currently, Plaintiff had bona-fide religious beliefs and/or practices that the Companies claimed conflicted with their preferred scheduling.

105. Plaintiff has sincere and deeply held religious beliefs consistent with being a Catholic man that require him to attend Communion classes.

106. Plaintiff informed the Companies of his sincerely held beliefs, and that his religious observance and practice included attending Communion classes on Thursdays.

107. Plaintiff asked that he be permitted to take off work on Thursday evenings to attend Communion classes, which was consistent with his religious beliefs, observance, and practice.

108. Plaintiff's request would not have caused the Companies an undue hardship.

109. The Companies refused to allow Plaintiff to take off from work for his Communion classes.

110. The Companies did not offer Plaintiff any reasonable accommodation for Plaintiff's religious beliefs and/or practices.

111. The Companies violated Title VII by failing to reasonably accommodate Plaintiff's religious practices and/or beliefs.

112. The effect of the Companies' conduct complained of herein has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his employment status because of his religion.

113. The Companies' above-described conduct was willful, wanton, and/or committed with conscious and/or reckless indifference to Plaintiff's equal rights under the law.

114. As a result of the Companies' above-described discriminatory actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**Discriminatory Discharge Based on Religion in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII")**
**(As to All Defendants)**

115. Plaintiff incorporates by reference all paragraphs in this Complaint as if fully and separately set forth herein.

116. Plaintiff's religion is Catholicism.

117. In or about October 2020, Plaintiff informed the Companies that he could not work on Thursday evenings due to his sincerely held religious beliefs, observance, and/or practices.

118. The Companies refused to accommodate Plaintiff's religious beliefs, observance, and/or practices.

119. The Companies engaged in such disparate treatment of Plaintiff based upon him being a Catholic.

120. The Companies admit they terminated Plaintiff – at least in part – due to purported scheduling issues, i.e. because he requested not to work on Thursdays due to his sincerely held religious beliefs, observance, and/or practices.

121. Thus, the Companies violated Title VII by discriminating against Plaintiff because of Plaintiff's religion.

122. The Companies' above-described conduct was willful, wanton, and/or committed with conscious and/or reckless indifference to Plaintiff's equal rights under the law.

123. As a result of the Companies' above-described discriminatory actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

### FIFTH CLAIM FOR RELIEF
**Discrimination Based on Gender in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII")**
**(As to All Defendants)**

124. Plaintiff incorporates by reference all paragraphs in this Complaint as if fully and separately set forth herein.

125. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") prohibits adverse employment actions that are motivated by an employee's gender and prohibits discriminating against an employee based on gender.

126. Plaintiff, as a male employee, was entitled to the protections of Title VII.

127. The Companies terminated Plaintiff's employment.

128. The Companies' termination of Plaintiff's employment was motivated by Plaintiff's request for leave to be present for his daughter's birth and to care for his daughter.

129. The background circumstances support an inference that the Defendants are the types of unusual employers who discriminate against the majority, under certain circumstances.

130. The Defendants treated the male Plaintiff less favorably than his female counterparts, and the Plaintiff's gender – male – was a reason for the adverse employment action.

131. Upon information and belief, pregnant female employees were not treated the same as Plaintiff with respect to the retaliation and unlawful termination he experienced shortly after returning from his brief leave.

132. The Companies' actions denied Plaintiff equal employment opportunities by subjecting him to different terms and conditions of employment than his female and similarly situated coworkers who requested leave related to childbirth and childcare.

133. The Companies' unlawful and discriminatory practices complained of herein were intentional and done with malice or with reckless indifference to Plaintiff's federally-protected rights.

134. As a direct and proximate result of the Companies' unlawful and discriminatory practices described herein, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants and award the Plaintiff:

A. A declaratory judgment condemning the Defendants' willful violations of Colorado Wage and Hour Law;

B. A preliminary injunction prohibiting the Defendants from continuing their illegal wage and hour policies and practices;

C. A permanent injunction prohibiting the Defendants from continuing their illegal wage and hour policies and practices;

D. Monetary damages compensating the Plaintiff for each 10-minute rest period that was not provided;

E. All applicable statutory damages and penalties provided under Colorado Wage and Hour Law;

F. Back wages, front wages, and compensatory damages to the Plaintiff;

G. Liquidated damages under the FMLA;

H. Pre-judgment and post-judgment interest at the highest lawful rate;

I. The Plaintiff's reasonable attorneys' fees, as well as the costs of this action; and

J. Award such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 5th day of August, 2022.

HKM EMPLOYMENT ATTORNEYS LLP


By: *s/ Jesse K. Fishman*
Jesse K. Fishman (44807)
Claire E. Hunter (39504)
HKM Employment Attorneys LLP
730 17th Street, Suite 750
Denver, Colorado 80202
Telephone: (720) 668-8989
jfishman@hkm.com
chunter@hkm.com

*Attorneys for Plaintiff Homero Navarro*

20